UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

LABAR PAULIN,                                    :

                Plaintiff,        :        17 Civ. 1083 (AJP)

          -against-              :        **OPINION & ORDER**

NANCY A. BERRYHILL,                              :
Acting Commissioner of Social Security,
                              :

                Defendant.      :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

**ANDREW J. PECK, United States Magistrate Judge:**

        Plaintiff Labar Paulin, represented by counsel, brings this action pursuant to § 205(g) of the Social Security Act, 42 U.S.C. § 405(g), challenging the final decision of the Commissioner of Social Security denying his application for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI"). (Dkt. No. 1: Compl.) Presently before the Court are the parties' cross motions for judgment on the pleadings pursuant to Fed. R. Civ. P. 12(c). (Dkt. No. 14: Paulin Notice of Mot.; Dkt. No. 21: Comm'r Notice of Mot.) The parties have consented to decision of the case by a United States Magistrate Judge pursuant to 28 U.S.C. § 636(c). (Dkt. No. 16.)

        For the reasons set forth below, Paulin's motion for judgment on the pleadings (Dkt. No. 14) is <u>GRANTED</u> and the Commissioner's motion (Dkt. No. 21) is <u>DENIED</u>.

**FACTS**

**Procedural Background**

        Paulin filed for DIB and SSI on January 27, 2014, alleging a disability onset date of July 1, 2010. (Dkt. No. 12: Administrative Record ("R.") 197-205.) On June 17, 2015, Paulin, represented by counsel, had a hearing before Administrative Law Judge ("ALJ") Joani Sedaca (R.

37-101), who denied Paulin's benefits application in a written decision issued on August 5, 2015 (R. 20-32). ALJ Sedaca's decision became the Commissioner's final decision when the Appeals Council denied review on December 12, 2016. (R. 1-3.)

## Non-Medical Evidence and Testimony

Born on March 10, 1990, Paulin was twenty years old at the alleged July 1, 2010 onset of his disability. (R. 197.) Paulin testified that he "suffer[s] from anxiety, depression, [fear of] crossing the streets, panic attacks, and headaches," but has no physical issues and does not suffer from any illnesses. (R. 43.)[1] Paulin testified that he is single with no children (R. 44) and lives in an apartment with his mother (R. 64-65). Paulin graduated from high school where he was enrolled in "regular classes," and "tried to attend . . . college but it didn't work out"; Paulin testified that he dropped out after a month because he "started . . . getting sick, having panic attacks . . . [,] feeling weird, nervous, having bad headaches . . . [and] just wasn't . . . feeling the same." (R. 44-45.) Paulin began experiencing these issues during high school and the symptoms intensified after graduation. (R. 45-46.) Paulin testified that his condition had deteriorated over the past seven years. (R. 76.)

Paulin testified that his "mother usually takes [him] places . . . because [he] ha[s] difficulties going some places . . . by [him]self," and that "for the last seven years" he only used public transportation when accompanied by his mother due to his "nervousness, . . . panic attacks, fears of crossing the street, and feeling paranoid." (R. 47-48.) Paulin testified that he was diagnosed with "[a]goraphobia, social anxiety, and panic attacks," which cause hyperventilation and chest pains

---

[1] Paulin's counsel also stated at the hearing before ALJ Sedaca that although Paulin was overweight, Paulin's physical problems were "nothing . . . really significant to the case." (R. 43.)

and resulted in his admission to the emergency room in 2009.  (R. 48-50.)  Paulin attended "talk therapy" from 2009 through 2010, but stopped when his insurance benefits were reduced; although Paulin testified that he now has insurance, he has not attended talk therapy because he has not received a referral from his psychiatrist.  (R. 51-53.)

Paulin worked as a security guard with Epic Security from February 2012 through June 2012 when he was fired for lateness and "[t]hey started seeing that . . . [Paulin] couldn't be around people." (R. 61-63.)  Prior to joining Epic Security, Paulin took a one-week security training course and passed a certification exam.  (Id.)  Paulin next worked as a security guard with Madison Security from June 2012 through October 2012 when he was fired because he "got to things slower than others" and "was missing a lot of days."  (R. 63-64.)

Paulin last worked as a security guard with Cambridge Security from October 2012 through the fall of 2013 (R. 53), when his employer informed him that he "wasn't equipped for the job . . . because of [his] awkwardness" (R. 56-57).  Paulin took too long to complete assignments and often was late to work.  (R. 57-58.)  Paulin has not looked for work since being terminated from Cambridge Security.  (R. 71.)

Paulin testified that he got to work by taking the bus or getting a ride from his brother.  (R. 59.)  When ALJ Sedaca remarked that Paulin previously testified that for the past seven years he only used public transportation when accompanied by his mother (see page 2 above), Paulin responded that he had to "force [him]self" to go alone if his mother was unavailable.  (R. 59-60.)

Paulin testified that he bathes but sometimes his clothes are not "on properly or correctly" because he does not "care how [he] look[s]."  (R. 60.)  In a February 2014 function report, Paulin wrote that it "takes 2 hours to get dress[ed]," over an hour to "shower with difficulty," and he "can't do hair mom has to pay for barber" (R. 256), although he can feed himself and use the

bathroom (R. 259). Paulin testified that he has difficulty sleeping and sometimes "can't sleep at all." (R. 70-71.) Paulin's mother cleans, cooks, and does the laundry and grocery shopping; Paulin testified that his "weirdness" and "awkwardness" completely prevent him from doing any of the foregoing or assisting his mother in doing so. (R. 65-68.)

Paulin remains in his apartment "most of the time" watching television and sometimes using his computer, and spends time with his friend who visits "maybe twice a week." (R. 68-69.) Paulin's cousin visits him "often" (R. 49), and Paulin's brother visits as well (R. 70). Paulin testified that he "[s]ometimes" speaks with his friend and grandmother on the phone (R. 70), but wrote in his function report that he does not "socialize with neighbors [and] only see[s] family sometime[s]" (R. 258). Paulin's function report lists his hobbies as "watching tv, playing sports[,] hanging with friends, [and] movies." (R. 257.) However, aside from watching television "daily," Paulin wrote that he was "[n]o longer able to play sports or go out with friends" and he did not "have friends anymore have not seen movie in years." (Id.) Paulin further wrote that he "use[d] to be able to go out and enjoy movies, parties, work, friends and family" but no longer does. (R. 258.) Paulin stated that he has a "short attention span" and cannot finish what he starts, e.g., chores or reading, because "[i]t takes hours never finish." (R. 261.) Paulin wrote that he could "sometimes" follow spoken or written instructions (id.), has trouble remembering things and cannot "deal with stress or change" (R. 263).

Lisa O'Neal, Paulin's mother, also testified at the hearing before ALJ Sedaca. (R. 80.) O'Neal testified that she first noticed Paulin's mental limitations when he was a child and "[h]e was a little slower than [O'Neal's] other kids." (R. 81.) O'Neal stated that, in 2008, Paulin dropped out of college after a month because "he locked himself in the room. He wouldn't go to classes. He lost weight. He couldn't function." (R. 84.) According to O'Neal, "that was around the time that

everything . . . fell apart for" Paulin.  (R. 85.)

O'Neal stated that Paulin "is not comfortable around people.  He has . . . fears of social anxiety." (R. 87.)  O'Neal reiterated that she "do[es] everything in the home" and that Paulin does not "assist [her] at all" because "he's very awkward in doing things . . . so it's easier for [O'Neal] to do."  (R. 87-88.)  O'Neal stated that Paulin spends most of his time in his room sometimes watching television or "he'll sit there with no TV, no nothing on." (R. 90-91.)  Paulin's friend visits Paulin or takes Paulin to his home, and sometimes Paulin socializes with neighbors "downstairs but he'll come right back up." (R. 90.)

O'Neal testified that Paulin sees Dr. Hameedi once a month (R. 85), for an hour to an hour and a half each session (R. 87).  Although Paulin attended talk therapy in the past, O'Neal stated that Paulin stopped doing so when his insurance benefits terminated; yet, as Paulin testified, although Paulin now has insurance benefits, Paulin has not been referred for talk therapy.  (R. 85-86.)

Vocational expert Julie Andrews testified at the hearing before ALJ Sedaca.  (R. 92.) ALJ Sedaca posed four hypothetical questions to Andrews, the first of which asked:

> Please assume an individual with the same vocational profile as [Paulin] who has a residual functional capacity to perform the range of work without any exertional limits; however, it must be simple, routine, repetitive tasks, which are only one or two steps.  It must be only occasional, decision-making required.  There must be only occasional changes in the work setting including the procedures and the tools. There must be no public contact.  There must be only occasional contact with coworkers including supervisors.

(R. 93.)  Andrews testified that an individual with these limitations would not be able to perform Paulin's past relevant work as a security guard.  (R. 93-94.)  However, there were unskilled jobs in the national economy that such an individual could perform, including laundry laborer, industrial cleaner and kitchen helper.  (R. 94.)

ALJ Sedaca's second hypothetical asked: "In addition to the above limitations, the individual is now limited to unscheduled absences more than . . . two times per month." (R. 95.) Andrews testified that such absences would affect the above positions "to the point where there would not be any full-time competitive employment positions that would be viable." (Id.)

ALJ Sedaca's third hypothetical "in place of [hypothetical] two" asked: "So we're no longer talking about unscheduled absences. In addition to the above limitations [outlined in hypothetical one], . . . the individual is now limited to being off task due to psychological issues more than 10% of the time. Would that [a]ffect the above job[s]?" (Id.) Andrews stated that these limitations would eliminate "any full-time competitive employment positions," assuming that the time off-task would be "outside of normal breaks and rest periods." (Id.)

ALJ Sedaca's fourth hypothetical "in place of both [hypotheticals] two and three" asked: "So we're not talking about the unscheduled absences or the psychological off-task but instead . . . - - let's say lateness to work - - we'll say if it is more than . . . five times per month, would that [a]ffect the above jobs?" (R. 95-96.) Andrews responded that "[i]t would be unlikely that the individual would be able to maintain employment because of that." (R. 96.)

**Medical Evidence Before the ALJ**

**Montefiore Medical Center**

On November 21, 2008, psychiatrist Dr. Faiq Hameedi wrote a note stating that Paulin suffered from major depression and agoraphobia since September 2008. (R. 360.) Dr. Hameedi wrote that Paulin was "not able to attend school due to depression and anxiety." (Id.)

On the same date, November 21, 2008, Dr. Hameedi completed an "Outpatient Clinical Assessment Form" listing Paulin's symptoms as depression, anhedonia, feelings of worthlessness and guilt, decreased energy and motivation, panic attacks, flashbacks and social

anxiety. (R. 454.) Paulin was well groomed, had a guarded and suspicious attitude, constricted affect, depressed and anxious mood, delayed expressive speech, age-appropriate receptive language comprehension, slowed psychomotor activity, intact thought process, and no hallucinations, delusions or suicidal/homicidal ideation. (R. 456-57.) Paulin was alert, oriented to time, place and person, had intact immediate recall and remote memory, was able to perform simple calculations and serial sevens, and had intact abstraction, judgment and insight, as well as good impulse control. (R. 457.) Dr. Hameedi also completed a treatment plan stating that Paulin suffered from a panic disorder with major depression, and had a GAF of 50. (R. 458.)

Dr. Hameedi's December 15, 2008 progress note states that Paulin was non-compliant with his medication regimen. (R. 459.)[2] On February 2, 2009 and March 9, 2009, Dr. Hameedi wrote that Paulin had social anxiety but was compliant with his medication, Zoloft, the dose of which was increased from 50 to 100 mg. (R. 460-61.)

On March 24, 2009, Dr. Hameedi completed a "Confidential Medical Report Psychiatric Disability." (R. 462-63.) Dr. Hameedi wrote that Paulin's "[m]ental health estimate," personal awareness and motivation were fair, and that Paulin "need[ed] encouragement to inspire social interaction." (R. 463.) Dr. Hameedi further wrote that while Paulin had difficulty dealing with new people, his "[w]ork ability estimate" was good. (Id.)

On April 13, 2009, Dr. Hameedi wrote that Paulin was "[s]till afraid to go out" and increased Paulin's Zoloft prescription. (R. 464.)

On May 11, 2009, Dr. Hameedi completed a disability questionnaire listing Paulin's diagnoses as social anxiety disorder, panic disorder, major depression and agoraphobia. (R. 359.)

---

[2] Dr. Hameedi's progress notes are difficult to read and often completely illegible.

Dr. Hameedi wrote that Paulin had "poor memory and concentration and [was] afraid to go out," and that his future employability was "undetermined." (Id.)

On June 8, August 15 and October 26, 2009, Dr. Hameedi reported that Paulin was still afraid to go out and suffered from social anxiety. (R. 467-69.)

On September 8, 2009, Paulin had an annual visit at Montefiore Children's Hospital with Dr. Marc Orgel. (R. 299.) Dr. Orgel noted that Paulin was "diagnosed with depression, social anxiety, [and] agoraphobia" and that Paulin's psychiatrist recommended imaging of his head after he sustained a sports injury. (Id.) Paulin had a normal appearance, was alert with a flat affect, and was "oriented times 3." (R. 300.) Dr. Orgel wrote that Paulin had major depression and should continue to see a psychiatrist. (Id.)

On October 8, 2009, Paulin underwent an MRI of his brain that was normal. (R. 308.)

On November 23, 2009, Dr. Hameedi wrote that Paulin continued to experience social anxiety; Paulin, however, was non-compliant with his medication and informed Dr. Hameedi that he did "not want to take anti psychotics." (R. 470.) The same date, November 23, 2009, Dr. Hameedi completed a "Treatment Plan Update" form. (R. 471.) Dr. Hameedi assigned Paulin a GAF of 45 and, in the "Review of Progress" portion of his notes, Dr. Hameedi checked a box stating that Paulin "[c]ontinues with/or recurrence of acute presenting symptoms." (Id.)

On February 5, 2010, Paulin was admitted to New York Presbyterian Hospital's Emergency Department for depression, anxiety and agoraphobia. (R. 335.) Paulin was admitted to the Emergency Department "after a call from his mother" who "was concerned that [Paulin was] isolative and withdrawn. [Paulin] refuse[d] to leave the house to do anything." (R. 342.) The triage notes further state that Paulin was "isolative, depressed [and] ha[d] not left house since Nov," though

the "Reassessments" section states that Paulin was "stable, alert, playing Nintendo in no distress." (R. 340.) Paulin denied suicidal or homicidal ideation, denied visual or auditory hallucinations, was oriented "x3," had an appropriate appearance, a cooperative attitude, a linear thought process, clear speech and a flat affect. (R. 341.) Paulin's recent memory, remote memory and concentration were good, but his insight and judgment were poor. (Id.) The attending physician, Dr. Angel Caraballo, diagnosed Paulin with chronic social anxiety and depression with a GAF of 40. (Id.) Dr. Caraballo wrote that Paulin was "isolative, withdrawn and depressed," "[n]on-compliant with treatment @ Montefiore," and "would not take meds prescribed by psychiatrist." (Id.) Regarding Paulin's departure from college, the notes state that Paulin "[r]efused to go to classes [and] did not eat." (R. 342.) Paulin was "able to follow goal directed conversation" and had "[n]o previous in-patient hospitalizations." (Id.)

After his initial assessment, Dr. Caraballo completed a "CCPEP Evaluation." (R. 346-50.) Paulin "report[ed] that he feels very nervous sometimes . . . mostly when he is around other people," although he denied fearing harm from others or auditory/visual hallucinations. (R. 346.) Paulin stated that he stayed home all day listening to music and watching television, "ha[d] not been getting out of the house much" and did "not have many friends." (Id.) Paulin "denie[d] any feelings of depression" and "report[ed] that his sleep [was] good as well as his appetite." (Id.) Paulin's energy level was "regular," his concentration was "good," and he "denie[d] any feelings of guilt, hopelessness or helplessness," suicidal/homicidal intent, "symptoms of mania" or "any specific fears." (Id.) However, Paulin's mother and aunt reported that Paulin had problems with activities of daily living and sometimes sat "in the dark for hours by himself." (Id.) Paulin had stopped taking Zoloft and Abilify because he felt they were not helping. (Id.)

Dr. Caraballo wrote that Paulin had a cooperative attitude, poor hygiene, euthymic

mood, slow psychomotor activity, flat affect, monotone speech, appropriate thought content, poor insight, appropriate judgment and impulse control, and good "Orientation/Memory/Concentration." (R. 348-49.) Dr. Caraballo diagnosed Paulin with "Psychotic Disorder NOS" and generalized anxiety disorder with a GAF of 45. (R. 349-50.) Dr. Caraballo discharged Paulin with instructions to follow up with his psychiatrist Dr. Hameedi and resume taking his medication after concluding that Paulin was not a danger to himself or others. (R. 350.)

On April 12, 2010, Dr. Hameedi wrote that Paulin "feels much less anxiety and is able to go outside without family. Denies any panic attacks. Reduced agoraphobia." (R. 472.)

On November 22, 2010, Dr. Hameedi completed a second "Treatment Plan Update" form and reported that Paulin exhibited "[s]ignificant improvement" since his last treatment plan update on November 23, 2009, and had a GAF of 55. (R. 475; see page 8 above.)

On February 28, 2011, Dr. Hameedi wrote that Paulin had "[r]educed social anxiety." (R. 476.) Dr. Hameedi's notes on October 17, 2011, November 28, 2011, January 30, 2012, April 10, 2012, May 29, 2012, and December 3, 2012, include little legible detail aside from references to Paulin's social anxiety and his compliance with medication. (See R. 477-82.)

On December 3, 2012, Dr. Hameedi completed a third "Treatment Plan Update" form and reported that Paulin exhibited "[s]ignificant improvement" since his last treatment plan update on November 22, 2010, and maintained his GAF of 55. (R. 483.) Dr. Hameedi also reported that Paulin had a new girlfriend. (Id.)

On September 30, 2013, Dr. Hameedi completed a fourth "Treatment Plan Update" form and checked a box stating that Paulin "[c]ontinues with/or recurrence of acute presenting symptoms" since his last treatment plan update on December 3, 2012. (R. 486.) Specifically, Dr. Hameedi wrote that Paulin "has a job" but is "[a]fraid to go to the store"; however, unlike previous

treatment plans, Dr. Hameedi left the GAF assessment blank.  (Id.)

On November 25, 2013, Dr. Hameedi wrote a note stating that he treated Paulin for agoraphobia and panic attacks.  (R. 357.)

On March 18, 2014, Dr. Hameedi completed a psychiatric report diagnosing Paulin with moderate "Anxiety Disorder NOS" with a GAF of 60.  (R. 370-75.)  Dr. Hameedi opined that Paulin had marked limitations relating to others, interacting appropriately with the public and in his activities of daily living, and marked deterioration of his personal habits.  (R. 373.)  Paulin also was markedly limited in his ability to perform complex tasks, perform tasks requiring minimal contact with others, tolerate work-related stress, maintain concentration and attention, and set realistic goals or make plans independently.  (R. 373-74.)  Dr. Hameedi further opined that Paulin had moderate limitations comprehending and following simple or detailed instructions, and performing simple or repetitive tasks.  (R. 373.)  Paulin had additional moderate limitations performing varied tasks, performing tasks requiring frequent contact with others, responding appropriately to supervision and criticism, and meeting production, quality and attendance standards.  (R. 374.)  Dr. Hameedi wrote that Paulin had "additional difficulties in organizing, regulating or managing himself" due to his "poor interpersonal skills," and Paulin could not use public transportation alone as he was "afraid of being hit by cars."  (R. 371, 374-75.)  Dr. Hameedi wrote that Paulin's symptoms lasted or were expected to last at least twelve months.  (R. 372.)

On April 23, 2014, Dr. Hameedi completed a medical source statement regarding Paulin's ability to do work-related activities.  (R. 450-52.)  Dr. Hameedi wrote that Paulin had moderate limitations in his ability to understand, remember and carry out simple instructions, and make judgments on complex work-related decisions.  (R. 450.)  Paulin was markedly limited in his ability to make judgments on simple work-related decisions; understand, remember and carry out

complex instructions; interact appropriately with the public, supervisors and coworkers; and respond appropriately to usual work situations and to changes in a routine work setting. (R. 450-51.) Dr. Hameedi noted that Paulin's mental impairments also resulted in his "[p]oor memory and concentration." (R. 451.) Dr. Hameedi stated that Paulin "remains socially isolated [because of] fear of going out." (Id.)

However, on April 25, 2014, Dr. Hameedi wrote that Paulin was "feeling happy," "[d]enied any acute depression" and only "ha[d] some residual social anxiety." (R. 490.) On August 22, 2014, Dr. Hameedi wrote that Paulin was "socially isolated but [was] able to go out with friends." (R. 491.)

On March 13, 2015, Dr. Hameedi completed a second psychiatric report diagnosing Paulin with agoraphobia and panic attacks with a GAF of 60. (R. 444-49.) In contrast to his March 18, 2014 psychiatric report, Dr. Hameedi wrote that Paulin's sole moderate limitation was in his ability to perform repetitive tasks. (R. 447; see page 11 above.) Dr. Hameedi opined that Paulin had marked limitations relating to others, interacting with the public and in his activities of daily living, and marked deterioration of his personal habits. (R. 447.) Paulin further was markedly limited in his ability to comprehend and follow simple instructions; perform simple, complex and varied tasks or tasks requiring frequent contact with others; respond appropriately to supervision and criticism; tolerate work-related stress; maintain concentration and attention; and meet production, quality and attendance standards. (R. 447-48.) Moreover, Dr. Hameedi opined that Paulin had extreme limitations comprehending and following detailed instructions, performing tasks requiring minimal contact with others, and setting realistic goals or making plans independently. (Id.) Dr. Hameedi wrote that Paulin's symptoms lasted or were expected to last at least twelve months (R. 446), and that Paulin was "not able to work" (R. 449).

On June 12, 2015, Dr. Hameedi completed a "Mental Impairment Questionnaire." (R. 523-24.) Dr. Hameedi opined that Paulin was "[u]nable to meet competitive standards" in all but two categories of "mental abilities and aptitudes needed to do unskilled," "semiskilled and skilled work" and "particular types of jobs," including the ability to understand and remember very short and simple instructions, maintain attention for two hours at a time, deal with normal work stress, set realistic goals, and interact appropriately with others. (Id.) Dr. Hameedi opined that Paulin was "[s]eriously limited" in the two remaining categories—the ability to make simple work-related decisions and be aware of workplace hazards. (R. 523.) Dr. Hameedi wrote that Paulin would be absent from work more than four days per month because of his psychological limitations. (R. 524.)

**Michael Kushner, Ph.D.**

On February 24, 2014, Paulin received a consultative psychiatric evaluation from Dr. Michael Kushner of Industrial Medicine Associates. (R. 366-69.) Paulin arrived at the evaluation via the "Access-a-Ride" service accompanied by his mother. (R. 366.) Paulin reported that he lived with his mother and obtained "a high school diploma under regular education." (Id.) Paulin further stated that "[h]e was employed doing security work for a period of four months, ending in 09/13 when he was fired for not being able to do the job." (Id.) Paulin reported no psychiatric hospitalizations or outpatient treatment history aside from his monthly visits with Dr. Hameedi. (Id.)

Paulin reported difficulty falling asleep, a loss of appetite, "depressive symptoms including social withdrawal," and no suicidal ideation although "he did have suicidal thoughts about one month ago." (Id.) Paulin claimed "that he ha[d] a great deal of social anxiety," "[t]hat is, he report[ed] that he gets 'nervous and paranoid' around people. He also report[ed] having agoraphobia

and . . . that sometimes being outside and around people can develop into panic symptoms." (Id.) Paulin had "no symptoms of mania or thought disorder," but "report[ed] memory and concentration trouble." (Id.) Paulin reported that he dressed, bathed and groomed himself on a daily basis, but his mother did the household chores and he did not take public transportation or socialize. (R. 368.) Dr. Kushner wrote that Paulin's "[a]daptive functioning would seem to be somewhat compromised." (Id.)

Dr. Kushner found that Paulin's "[d]emeanor and responsiveness to questions was cooperative [and his] [m]anner of relating, social sills, and overall presentation were fair." (R. 367.) Paulin had fair grooming and hygiene, normal posture and motor behavior, appropriate eye contact, fluent speech intelligibility, clear voice quality, and adequate expressive and receptive language. (Id.) Paulin was "[c]oherent and goal directed with no evidence of hallucinations, delusions, or paranoia during the evaluation setting." (Id.) Paulin had an anxious affect, a "[m]ostly euthymic" mood, clear sensorium, "[c]lear x3" orientation, his attention and concentration were mildly impaired, his recent and remote memory skills were "[i]mpaired possibly due to lack of full effort," his intellectual functioning was below average and his insight and judgment were fair. (R. 367-68.)

Dr. Kushner concluded that Paulin had mild limitations following and understanding simple directions and instructions and performing simple tasks independently; mild to moderate limitations maintaining attention, concentration and a regular schedule, learning new tasks and performing complex tasks under supervision; mild limitations making appropriate decisions; and "moderate to at times marked limitations" relating adequately with others and appropriately dealing with stress. (R. 368.)

Dr. Kushner concluded: "The results of the present evaluation appear to be consistent with psychiatric problems, but in itself, this does not appear to be significant enough to interfere

with [Paulin's] ability to function on a daily basis." (Id.) Dr. Kushner diagnosed Paulin with unspecified anxiety and depressive disorders; he recommended that Paulin continue psychiatric treatment "as currently provided" and "[a]lso consider some type of vocational training as [Paulin] appear[ed] to be capable of working" at a job "that does not require a great deal of social interaction." (R. 368-69.) Dr. Kushner found that Paulin's prognosis was "[f]air to guarded." (R. 369.)

### E. Kamin, Ph.D.

On February 28, 2014, Dr. E. Kamin completed a "Medically Determinable Impairments And Severity" form after reviewing some of Paulin's medical records. (R. 102-12.) Dr. Kamin opined that Paulin had mild limitations in activities of daily living, moderate limitations in maintaining social functioning, and moderate limitations maintaining concentration, persistence or pace. (R. 107.) Dr. Kamin found that Paulin was not significantly limited in his ability to remember locations and work-like procedures, understand, remember and carry out very short and simple instructions or make simple work-related decisions, although he was moderately limited in his ability to understand, remember and carry out detailed instructions. (R. 108-09.) Paulin also was moderately limited in his ability to maintain attention and concentration for extended periods, perform activities within a schedule, maintain regular attendance and be punctual, sustain an ordinary routine without special supervision, work in coordination with others without being distracted, and complete a normal workday and workweek without interruptions from psychologically based symptoms. (R. 109.) Paulin furthermore had moderate limitations in some categories of social interaction and adaptation, including his ability to interact with the general public and take public transportation. (R. 109-10.)

Based on his review, Dr. Kamin found that Paulin was not disabled (R. 112), and was

capable of unskilled, entry level work in a low contact setting (R. 110-11).

**ALJ Sedaca's Decision**

On August 5, 2015, ALJ Sedaca denied Paulin's benefits application. (R. 20-32.) ALJ Sedaca applied the appropriate five step legal analysis. (R. 24-25.) First, she found that Paulin "has not engaged in substantial gainful activity since July 1, 2010, the alleged onset date." (R. 25.) Second, ALJ Sedaca found that Paulin had the "following severe impairments: social anxiety disorder and depressive disorder." (Id.) Third, ALJ Sedaca found that Paulin did "not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1," giving "special consideration to the listings for mental disorders (12.00)." (R. 26.) ALJ Sedaca next determined that Paulin had the residual functional capacity ("RFC") to perform

> a full range of work at all exertional levels but with the following non-exertional limitations: [Paulin] is limited to simple, routine, repetitive tasks involving no more than two steps. He can tolerate only occasional decision-making and no more than occasional changes in the work setting, including changes in procedures and tools. [Paulin] cannot have any contact with the public and can have no more than occasional contact with coworkers, including supervisors.

(R. 27.)

ALJ Sedaca noted Paulin's "history of mental health problems" and treatment with psychiatrist Dr. Hameedi since 2008, whose treatment notes show that Paulin "has had consistent complaints of anxiety," as well as depression and agoraphobia. (R. 27-28.) ALJ Sedaca noted that Dr. Hameedi "opined that [Paulin] would never be capable of sustaining employment." (R. 27.)

ALJ Sedaca gave Dr. Hameedi's opinions "some weight," stating that the "extreme limitations noted by [Dr. Hameedi] are not fully credited because of the conservative treatment history and the absence of severe symptoms noted in the treatment records." (R. 30.) ALJ Sedaca

discussed Dr. Hameedi's treatment notes from April 2014 in which Paulin denied any acute depression and suffered only some residual anxiety, and the August 2014 notes stating that Paulin was socially isolated but able to go out with friends. (R. 28.) ALJ Sedaca noted that Dr. Hameedi twice assigned Paulin a GAF score of 60 in March 2014 and March 2015, which was "incompatible with the particular limitations reported." (R. 28-30.) ALJ Sedaca further "noted that [Paulin] is not receiving therapy despite his alleged severe limitations" aside from his treatment with Dr. Hameedi. (R. 30.)

ALJ Sedaca discussed Dr. Kushner's consultative examination that stated Paulin had mild limitations following simple instructions, mild to moderate limitations maintaining attention and concentration, and moderate to marked limitations relating adequately with others and dealing with stress. (R. 28.) ALJ Sedaca gave Dr. Kushner's opinion "[s]ome to little weight . . . because his opinion was based only on a one-time examination and some of the more severe restrictions noted by Dr. Kushner [we]re not supported by the treatment records and the conservative treatment history." (R. 30.)

Finally, ALJ Sedaca noted that reviewing psychologist Dr. Kamin found that Paulin had mild restrictions of daily activities, and moderate limitations maintaining social functioning and maintaining concentration, persistence, or pace. (R. 29.) ALJ Sedaca gave Dr. Kamin's opinions "some weight" because "overall, the evidence suggest[ed] somewhat greater restrictions than were noted by Dr. Kamin." (R. 30.) "[L]ess weight" was given to Dr. Kamin's opinions because he never examined Paulin and did not review the entirety of the medical evidence. (Id.)

ALJ Sedaca found Paulin's "statements concerning the intensity, persistence and limiting effects of [his] symptoms [we]re not entirely credible." (Id.) Although Paulin "reported significant problems with difficulty leaving his home and inability to travel independently . . .[,] in

other testimony and in other reports, he is noted to be able to socialize with friends and . . . neighbors." (Id.) Additionally, ALJ Sedaca wrote, Paulin "conceded that when he was working he was able to use public transportation independently though he testified that he had been travelling only with his mother for the past 7 years." (Id.) ALJ Sedaca opined that Paulin's described limitations also were "incompatible with the relatively minimal treatment he has received." (Id.) Paulin treated with Dr. Hameedi "several times per year but otherwise" received no therapy (id.); in particular, Paulin testified that he "ha[d] not received any psychological therapy since 2010" (R. 29). And, although Paulin took psychiatric medications, "there ha[d] been little variation in his prescriptions since 2009." (R. 30.)

ALJ Sedaca concluded that the above RFC assessment was "supported by the treatment records showing some mental health problems but a consistent conservative treatment history." (R. 31.) Moreover, ALJ Sedaca wrote that the RFC was supported by Paulin's "reported activities like in fact being able to use public transportation when he worked and being able to concentrate well enough to watch television and even pass a training course for security guard work." (Id.) Paulin further socialized with one friend and got along with his family members. (Id.)

ALJ Sedaca next determined that Paulin had no past relevant work, but was considered a younger individual with a high school education who spoke English. (Id.) Considering Paulin's "age, education, work experience, and residual functional capacity," ALJ Sedaca concluded that jobs existed in significant numbers that Paulin could perform, including those identified by vocational expert Julie Andrews such as laundry laborer, industrial cleaner and kitchen helper. (R. 31-32.) ALJ Sedaca accordingly concluded that Paulin had "not been under a disability, as defined in the Social Security Act, from July 1, 2010, through the date of [her] decision," August 5, 2015. (R. 32.)

## ANALYSIS

I.    **THE APPLICABLE LAW**

    A.    **Definition Of Disability**[3/]

A person is considered disabled for Social Security benefits purposes when he is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A); see, e.g., Barnhart v. Thomas, 540 U.S. 20, 23, 124 S. Ct. 376, 379 (2003); Barnhart v. Walton, 535 U.S. 212, 214, 122 S. Ct. 1265, 1268 (2002); Impala v. Astrue, 477 F. App'x 856, 857 (2d Cir. 2012).[4/]

> An individual shall be determined to be under a disability only if [the combined effects of] his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work

---

[3/]    As the Commissioner notes (Dkt. No. 22: Comm'r Br. at 1, 13-14), Paulin applied for child's insurance benefits with a disability onset date prior to age 22 (see R. 23, 201-02).  See, e.g., Camille v. Colvin, 652 F. App'x 25, 26 n.1 (2d Cir. 2016); 42 U.S.C. § 402(d)(1)(G).  "In the context of determining eligibility for disabled adult child's benefits, the term 'disability' has substantially the same definition as it does in traditional, adult disability cases," and "the familiar five-step analysis" also applies.  Harper v. Berryhill, No. 16-CV-01168, 2017 WL 3085806 at *3 (D. Conn. July 20, 2017) (quotations omitted); accord, e.g., Trombley v. Colvin, No. 15-CV-00567, 2016 WL 5394723 at *2 n.3 (N.D.N.Y. Sept. 27, 2016).

[4/]    See also, e.g., Salmini v. Comm'r of Soc. Sec., 371 F. App'x 109, 111 (2d Cir. 2010); Betances v. Comm'r of Soc. Sec., 206 F. App'x 25, 26 (2d Cir. 2006); Surgeon v. Comm'r of Soc. Sec., 190 F. App'x 37, 39 (2d Cir. 2006); Rodriguez v. Barnhart, 163 F. App'x 15, 16 (2d Cir. 2005); Malone v. Barnhart, 132 F. App'x 940, 941 (2d Cir. 2005); Butts v. Barnhart, 388 F.3d 377, 383 (2d Cir. 2004), amended on other grounds, 416 F.3d 101 (2d Cir. 2005); Veino v. Barnhart, 312 F.3d 578, 586 (2d Cir. 2002); Draegert v. Barnhart, 311 F.3d 468, 472 (2d Cir. 2002); Shaw v. Chater, 221 F.3d 126, 131 (2d Cir. 2000); Brown v. Apfel, 174 F.3d 59, 62 (2d Cir. 1999); Rosa v. Callahan, 168 F.3d 72, 77 (2d Cir. 1999); Tejada v. Apfel, 167 F.3d 770, 773 (2d Cir. 1999); Balsamo v. Chater, 142 F.3d 75, 79 (2d Cir. 1998); Perez v. Chater, 77 F.3d 41, 46 (2d Cir. 1996).

which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B); see, e.g., Barnhart v. Thomas, 540 U.S. at 23, 124 S. Ct. at 379; Barnhart v. Walton, 535 U.S. at 218, 122 S. Ct. at 1270.[5]

In determining whether an individual is disabled for disability benefit purposes, the Commissioner must consider: "(1) the objective medical facts; (2) diagnoses or medical opinions based on such facts; (3) subjective evidence of pain or disability testified to by the claimant or others; and (4) the claimant's educational background, age, and work experience." Mongeur v. Heckler, 722 F.2d 1033, 1037 (2d Cir. 1983) (per curiam).[6]

### B.    Standard Of Review

A court's review of the Commissioner's final decision is limited to determining whether there is "substantial evidence" in the record as a whole to support such determination. E.g., 42 U.S.C. § 405(g); Giunta v. Comm'r of Soc. Sec., 440 F. App'x 53, 53 (2d Cir. 2011).[7] "'Thus,

---

[5]    See also, e.g., Salmini v. Comm'r of Soc. Sec., 371 F. App'x at 111; Betances v. Comm'r of Soc. Sec., 206 F. App'x at 26; Butts v. Barnhart, 388 F.3d at 383; Draegert v. Barnhart, 311 F.3d at 472; Shaw v. Chater, 221 F.3d at 131-32; Rosa v. Callahan, 168 F.3d at 77; Balsamo v. Chater, 142 F.3d at 79.

[6]    See, e.g., Brunson v. Callahan, No. 98-6229, 199 F.3d 1321 (table), 1999 WL 1012761 at *1 (2d Cir. Oct. 14, 1999); Brown v. Apfel, 174 F.3d at 62.

[7]    See also, e.g., Prince v. Astrue, 514 F. App'x 18, 19 (2d Cir. 2013); Salmini v. Comm'r of Soc. Sec., 371 F. App'x 109, 111 (2d Cir. 2010); Acierno v. Barnhart, 475 F.3d 77, 80-81 (2d Cir.), cert. denied, 551 U.S. 1132, 127 S. Ct. 2981 (2007); Halloran v. Barnhart, 362 F.3d 28, 31 (2d Cir. 2004); Jasinski v. Barnhart, 341 F.3d 182, 184 (2d Cir. 2003); Veino v. Barnhart, 312 F.3d 578, 586 (2d Cir. 2002); Shaw v. Chater, 221 F.3d 126, 131 (2d Cir. 2000); Brown v. Apfel, 174 F.3d 59, 61 (2d Cir. 1999); Rosa v. Callahan, 168 F.3d 72, 77 (2d Cir. 1999); Tejada v. Apfel, 167 F.3d 770, 773 (2d Cir. 1999); Perez v. Chater, 77 F.3d 41, 46 (2d Cir. 1996); Rivera v. Sullivan, 923 F.2d 964, 967 (2d Cir. 1991); Mongeur v. Heckler, 722 F.2d 1033, 1038 (2d Cir. 1983) (per curiam); Dumas v. Schweiker, 712 F.2d (continued...)

the role of the district court is quite limited and substantial deference is to be afforded the Commissioner's decision.'" Morris v. Barnhart, 02 Civ. 0377, 2002 WL 1733804 at *4 (S.D.N.Y. July 26, 2002) (Peck, M.J.).[8/]

The Supreme Court has defined "substantial evidence" as "'more than a mere scintilla [and] such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Richardson v. Perales, 402 U.S. 389, 401, 91 S. Ct. 1420, 1427 (1971); accord, e.g., Selian v. Astrue, 708 F.3d 409, 417 (2d Cir. 2013); Rosa v. Callahan, 168 F.3d at 77; Tejada v. Apfel, 167 F.3d at 773-74.[9/] "[F]actual issues need not have been resolved by the [Commissioner] in accordance with what we conceive to be the preponderance of the evidence." Rutherford v. Schweiker, 685 F.2d 60, 62 (2d Cir. 1982), cert. denied, 459 U.S. 1212, 103 S. Ct. 1207 (1983). The Court must be careful not to "'substitute its own judgment for that of the [Commissioner], even if it might justifiably have reached a different result upon a de novo review.'" Jones v. Sullivan, 949 F.2d 57, 59 (2d Cir. 1991).[10/]

The Court, however, will not defer to the Commissioner's determination if it is "'the

---

[7/]    (...continued)
        1545, 1550 (2d Cir. 1983).

[8/]    See also, e.g., Florencio v. Apfel, 98 Civ. 7248, 1999 WL 1129067 at *5 (S.D.N.Y. Dec. 9, 1999) (Chin, D.J.) ("The Commissioner's decision is to be afforded considerable deference; the reviewing court should not substitute its own judgment for that of the Commissioner, even if it might justifiably have reached a different result upon a de novo review." (quotations & alterations omitted)).

[9/]    See also, e.g., Halloran v. Barnhart, 362 F.3d at 31; Jasinski v. Barnhart, 341 F.3d at 184; Veino v. Barnhart, 312 F.3d at 586; Shaw v. Chater, 221 F.3d at 131; Brown v. Apfel, 174 F.3d at 61; Perez v. Chater, 77 F.3d at 46.

[10/]   See also, e.g., Campbell v. Astrue, 465 F. App'x 4, 6 (2d Cir. 2012); Veino v. Barnhart, 312 F.3d at 586.

product of legal error.'" E.g., Duvergel v. Apfel, 99 Civ. 4614, 2000 WL 328593 at *7 (S.D.N.Y. Mar. 29, 2000) (Peck, M.J.); see also, e.g., Douglass v. Astrue, 496 F. App'x 154, 156 (2d Cir. 2012); Butts v. Barnhart, 388 F.3d 377, 384 (2d Cir. 2004), amended on other grounds, 416 F.3d 101 (2d Cir. 2005); Tejada v. Apfel, 167 F.3d at 773 (citing cases).

The Commissioner's regulations set forth a five-step sequence to be used in evaluating disability claims. 20 C.F.R. §§ 404.1520, 416.920; see, e.g., Barnhart v. Thomas, 540 U.S. 20, 24-25, 124 S. Ct. 376, 379-80 (2003); Bowen v. Yuckert, 482 U.S. 137, 140, 107 S. Ct. 2287, 2291 (1987). The Supreme Court has articulated the five steps as follows:

> Acting pursuant to its statutory rulemaking authority, the agency has promulgated regulations establishing a five-step sequential evaluation process to determine disability. If at any step a finding of disability or nondisability can be made, the SSA will not review the claim further. [1] At the first step, the agency will find nondisability unless the claimant shows that he is not working at a "substantial gainful activity." [2] At step two, the SSA will find nondisability unless the claimant shows that he has a "severe impairment," defined as "any impairment or combination of impairments which significantly limits [the claimant's] physical or mental ability to do basic work activities." [3] At step three, the agency determines whether the impairment which enabled the claimant to survive step two is on the list of impairments presumed severe enough to render one disabled; if so, the claimant qualifies. [4] If the claimant's impairment is not on the list, the inquiry proceeds to step four, at which the SSA assesses whether the claimant can do his previous work; unless he shows that he cannot, he is determined not to be disabled. [5] If the claimant survives the fourth stage, the fifth, and final, step requires the SSA to consider so-called "vocational factors" (the claimant's age, education, and past work experience), and to determine whether the claimant is capable of performing other jobs existing in significant numbers in the national economy.

Barnhart v. Thomas, 540 U.S. at 24-25, 124 S. Ct. at 379-80 (fns. & citations omitted).[11/]

The claimant bears the burden of proof as to the first four steps; if the claimant meets

---

[11/] Accord, e.g., Talavera v. Astrue, 697 F.3d 145, 151 (2d Cir. 2012); Rosa v. Callahan, 168 F.3d at 77; Tejada v. Apfel, 167 F.3d at 774; see also, e.g., Jasinski v. Barnhart, 341 F.3d at 183-84; Shaw v. Chater, 221 F.3d at 132; Brown v. Apfel, 174 F.3d at 62; Balsamo v. Chater, 142 F.3d 75, 79-80 (2d Cir. 1998); Perez v. Chater, 77 F.3d at 46; Dixon v. Shalala, 54 F.3d 1019, 1022 (2d Cir. 1995); Berry v. Schweiker, 675 F.2d 464, 467 (2d Cir. 1982).

the burden of proving that he cannot return to his past work, thereby establishing a prima facie case, the Commissioner then has the burden of proving the last step, that there is other work the claimant can perform considering not only his medical capacity but also his age, education and training. See, e.g., Barnhart v. Thomas, 540 U.S. at 25, 124 S. Ct. at 379-80.[12]

## C. The Treating Physician Rule

The "treating physician's rule" is a series of regulations set forth by the Commissioner in 20 C.F.R. § 404.1527 detailing the weight to be accorded a treating physician's opinion. Specifically, the Commissioner's regulations provide that:

> If we find that a treating source's medical opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record, we will give it controlling weight.

20 C.F.R. § 404.1527(c)(2); see, e.g., Rugless v. Comm'r of Soc. Sec., 548 F. App'x 698, 699-700 (2d Cir. 2013); Meadors v. Astrue, 370 F. App'x 179, 182 (2d Cir. 2010); Colling v. Barnhart, 254 F. App'x 87, 89 (2d Cir. 2007); Lamorey v. Barnhart, 158 F. App'x 361, 362 (2d Cir. 2006).

Further, the regulations specify that when controlling weight is not given a treating physician's opinion (because it is not "well-supported" by other medical evidence), the ALJ must consider the following factors in determining the weight to be given such an opinion: (1) the length of the treatment relationship and the frequency of examination; (2) the nature and extent of the treatment relationship; (3) the evidence that supports the treating physician's report; (4) how consistent the treating physician's opinion is with the record as a whole; (5) the specialization of the

---

[12] See also, e.g., Selian v. Astrue, 708 F.3d at 418; Betances v. Comm'r of Soc. Sec., 206 F. App'x 25, 26 (2d Cir. 2006); Green-Younger v. Barnhart, 335 F.3d 99, 106 (2d Cir. 2003); Rosa v. Callahan, 168 F.3d at 80; Perez v. Chater, 77 F.3d at 46; Berry v. Schweiker, 675 F.2d at 467.

physician in contrast to the condition being treated; and (6) any other factors which may be significant. 20 C.F.R. § 404.1527(c)(2)-(6); <u>see</u>, <u>e.g.</u>, <u>Cichocki</u> v. <u>Astrue</u>, 534 F. App'x 71, 74 (2d Cir. 2013); <u>Gunter</u> v. <u>Comm'r of Soc. Sec.</u>, 361 F. App'x 197, 197 (2d Cir. 2010).[13/]

       When a treating physician provides a favorable report, the claimant "is entitled to an express recognition from the [ALJ or] Appeals Council of the existence of [the treating physician's] favorable . . . report and, if the [ALJ or] Council does not credit the findings of that report, to an explanation of why it does not." <u>Snell</u> v. <u>Apfel</u>, 177 F.3d 128, 134 (2d Cir. 1999); <u>see</u>, <u>e.g.</u>, <u>Cichocki</u> v. <u>Astrue</u>, 534 F. App'x at 75; <u>Zabala</u> v. <u>Astrue</u>, 595 F.3d 402, 409 (2d Cir. 2010) (ALJ's failure to consider favorable treating physician evidence ordinarily requires remand pursuant to <u>Snell</u> but does not require remand where the report was "essentially duplicative of evidence considered by the ALJ"); <u>Ferraris</u> v. <u>Heckler</u>, 728 F.2d 582, 587 (2d Cir. 1984) ("We of course do not suggest that every conflict in a record be reconciled by the ALJ or the Secretary, but we do believe that the crucial factors in any determination must be set forth with sufficient specificity to enable [reviewing courts] to decide whether the determination is supported by substantial evidence." (citations omitted)); <u>Ramos</u> v. <u>Barnhart</u>, 02 Civ. 3127, 2003 WL 21032012 at *7, *9 (S.D.N.Y. May 6, 2003) (The ALJ's "'failure to mention such [treating physician report] evidence and set forth the reasons for his conclusions with sufficient specificity hinders [this Court's] ability . . . to decide whether his determination is supported by substantial evidence.'").

       The Commissioner's "treating physician" regulations were approved by the Second

---

[13/]   See also, <u>e.g.</u>, <u>Foxman</u> v. <u>Barnhart</u>, 157 F. App'x 344, 346-47 (2d Cir. 2005); <u>Halloran</u> v. <u>Barnhart</u>, 362 F.3d 28, 32 (2d Cir. 2004); <u>Shaw</u> v. <u>Chater</u>, 221 F.3d 126, 134 (2d Cir. 2000); <u>Clark</u> v. <u>Comm'r of Soc. Sec.</u>, 143 F.3d 115, 118 (2d Cir. 1998); <u>Schaal</u> v. <u>Apfel</u>, 134 F.3d 496, 503 (2d Cir. 1998).

Circuit in <u>Schisler</u> v. <u>Sullivan</u>, 3 F.3d 563, 568 (2d Cir. 1993).[14/]

## II.    APPLICATION OF THE FIVE STEP SEQUENCE

### A.    Paulin Was Not Engaged In Substantial Gainful Activity

The first inquiry is whether Paulin was engaged in substantial gainful activity after his application for benefits. "Substantial gainful activity" is defined as work that involves "doing significant and productive physical or mental duties" and "[i]s done (or intended) for pay or profit." 20 C.F.R. § 404.1510. ALJ Sedaca's conclusion that Paulin did not engage in substantial gainful activity during the applicable time period (<u>see</u> page 16 above) is not disputed. (<u>See generally</u> Dkt. No. 22: Comm'r Br.) The Court therefore proceeds with the analysis.

### B.    Paulin Demonstrated "Severe" Impairments That Significantly Limited His Ability To Do Basic Work Activities

The second step of the analysis is to determine whether Paulin proved that he had a severe impairment or combination of impairments that "significantly limit[ed his] physical or mental ability to do basic work activities." 20 C.F.R. § 404.1520(c). The ability to do basic work activities is defined as "the abilities and aptitudes necessary to do most jobs." 20 C.F.R. § 404.1522(b). "Basic work activities" include:

> walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling . . . seeing, hearing, and speaking . . . [u]nderstanding, carrying out, and remembering simple instructions . . . [u]se of judgment . . . [r]esponding appropriately to supervision, co-workers and usual work situations . . . [d]ealing with changes in a routine work setting.

20 C.F.R. § 404.1522(b)(1)-(6).

---

[14/]    Although not relevant here, the Court notes that the regulations governing the "treating physician rule" recently changed as to claims filed on or after March 27, 2017. <u>See</u> 20 C.F.R. §§ 404.1527, 404.1520c; <u>Revisions to Rules Regarding the Evaluation of Medical Evidence</u>, 82 FR 5844-01, 2017 WL 168819 at *5844, *5867-68 (Jan. 18, 2017).

ALJ Sedaca determined that Paulin's severe impairments were social anxiety disorder and depressive disorder. (See page 16 above.) ALJ Sedaca's findings regarding the step-two severity of these impairments are not contested. (See generally Dkt. No. 15: Paulin Br.; Dkt. No. 22: Comm'r Br.) Accordingly, the Court proceeds to the third step of the five-part analysis.

### C.  Paulin Did Not Have A Disability Listed In Appendix 1 Of The Regulations

The third step of the five-step test requires a determination of whether Paulin had an impairment listed in Appendix 1 of the Regulations. 20 C.F.R. Pt. 404, Subpt. P, App. 1. "These are impairments acknowledged by the [Commissioner] to be of sufficient severity to preclude gainful employment. If a claimant's condition meets or equals the 'listed' impairments, he or she is conclusively presumed to be disabled and entitled to benefits." Dixon v. Shalala, 54 F.3d 1019, 1022 (2d Cir. 1995).

ALJ Sedaca found that notwithstanding Paulin's severe impairments, he did "not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1," giving "special consideration to the listings for mental disorders (12.00)." (See page 16 above.) ALJ Sedaca stated that she compared the record medical evidence to the listing requirements, and found that Paulin had not met the necessary criteria. (R. 26-27.) Because ALJ Sedaca's finding that Paulin's impairments do not meet or medically equal the listed conditions is not disputed by the parties (see generally Dkt. No. 15: Paulin Br.; Dkt. No. 22: Comm'r Br.), the Court proceeds with the five-step analysis.

### D.  ALJ Sedaca's Evaluation Of The Medical Evidence

"The failure to provide '"good reasons" for not crediting the opinion of a claimant's treating physician is a ground for remand.' The ALJ is not permitted to substitute his own expertise or view of the medical proof for the treating physician's opinion or for any competent medical

opinion." <u>Greek</u> v. <u>Colvin</u>, 802 F.3d 370, 375 (2d Cir. 2015) (per curiam) (citation omitted); <u>see also</u>, <u>e.g.</u>, <u>Valentin</u> v. <u>Berryhill</u>, 16 Civ. 2956, 2017 WL 3917004 at *12 (S.D.N.Y. Sept. 6, 2017) ("The Second Circuit has stated that it will 'not hesitate to remand when the Commissioner has not provided "good reasons" for the weight given to a treating physician[']s opinion and . . . will continue remanding when we encounter opinions from ALJs that do not comprehensively set forth reasons for the weight assigned to a treating physician's opinion.'"); <u>Scheurer</u> v. <u>Berryhill</u>, No. 16-CV-06142, 2017 WL 3896405 at *16 (W.D.N.Y. Sept. 6, 2017) (same).

"'[B]ecause mental disabilities are difficult to diagnose without subjective, in-person examination, the treating physician rule is particularly important in the context of mental health.'" <u>Garcia</u> v. <u>Colvin</u>, 15 Civ. 5516, 2016 WL 845282 at *7 (S.D.N.Y. Mar. 3, 2016); <u>see also</u>, <u>e.g.</u>, <u>Mendez</u> v. <u>Comm'r of Soc. Sec.</u>, 15 Civ. 8017, 2017 WL 1194672 at *13 (S.D.N.Y. Feb. 27, 2017) ("'A mental health patient may have good days and bad days; [he] may respond to different stressors that are not always active. Thus, the longitudinal relationship between a mental health patient and [his] treating physician provides the physician with a rich and nuanced understanding of the patient's health that cannot be readily achieved by a single consultative examination.'"), <u>R. & R. adopted</u>, 2017 WL 1194687 (S.D.N.Y. Mar. 30, 2017).

ALJ Sedaca did not appropriately apply the treating physician rule in evaluating Dr. Hameedi's opinions. At the hearing, ALJ Sedaca asked Paulin why he was not attending "talk therapy," and questioned Paulin's mother why Paulin did not attend therapy in addition to his monthly treatment sessions with Dr. Hameedi. (<u>See</u> pages 3-5 above.) In discounting Dr. Hameedi's opinions, ALJ Sedaca highlighted Paulin's "conservative treatment history," specifically noting "that [Paulin] is not receiving therapy despite his alleged severe limitations." (<u>See</u> pages 16-17 above.)

Both Paulin and his mother testified that Paulin did not receive any additional therapy

because he had not obtained a referral from Dr. Hameedi. (See pages 3, 5 above.) However, Dr. Hameedi may have had a reason for not referring Paulin for "talk therapy" or other treatment, considering that his treatment sessions with Paulin were up to an hour and a half long and thus themselves might be considered "talk therapy." (See page 5 above; Dkt. No. 15: Paulin Br. at 14 ("[T]he fact that Mr. Paulin does not have a weekly psychologist in addition to his monthly psychiatrist should not be a factor here as the psychiatrist Dr. Hameedi appears to give 'talk therapy' to the claimant in exceptionally long 60-90 minute sessions . . . .").) If so, that would contradict ALJ Sedaca's conclusion that Paulin "is not receiving therapy," as opposed to mere medication management with Dr. Hameedi. (See page 17 above.) Moreover, ALJ Sedaca cited no medical testimony or records stating that Paulin would benefit from further therapy in addition to his treatment with Dr. Hameedi. ALJ Sedaca improperly substituted her own judgment regarding the propriety of further "talk therapy" instead of relying on a competent medical opinion. See, e.g., Greek v. Colvin, 802 F.3d at 375 ("The ALJ is not permitted to substitute his own expertise or view of the medical proof for the treating physician's opinion or for any competent medical opinion.").

Moreover, as Paulin argues, Dr. Hameedi's opinion "was given 'some weight,' but it was unclear how much. The ALJ did indicate that the extreme limitations found by Dr. Hameedi were 'not fully credited,' but there was no mention as to the many marked limitations." (Paulin Br. at 10.) It is not clear whether ALJ Sedaca discounted all of the more severe (including marked) limitations that Dr. Hameedi noted in his March 18, 2014 and March 13, 2015 psychiatric reports, or was referring to the extreme limitations noted only in the latter report. (See pages 11-12 above; see also Dkt. No. 23: Paulin Reply Br. at 4 ("The ALJ apparently does not mention whether these 'marked' limitations are credited by him or not. If they were, [Paulin] would certainly have been considered disabled.").) "[A]n ALJ must always give good, clear reasons in his decision for the

weight given to the claimant's treating physician's opinion." Bataille v. Astrue, No. 11-CV-0353, 2013 WL 3816742 at *4 (E.D.N.Y. July 22, 2013). Without a more specific description of the limitations ALJ Sedaca found unsupported by the treatment records and why, the Court cannot fully discern the reasoning behind assigning Dr. Hameedi's opinions "some weight," or determine which portions of his opinions were given such weight.[15]

Furthermore, ALJ Sedaca used similar language when assigning "[s]ome to little weight" to Dr. Kushner's report that included mild, moderate and marked limitations in different functional categories, finding that "some of the more severe restrictions noted by Dr. Kushner [we]re not supported by the treatment records and the conservative treatment history," without further explanation. (See pages 14, 17 above.) If by "conservative treatment history" ALJ Sedaca means the lack of "talk therapy," that reasoning is flawed for the reasons set forth above. And, as with Dr. Hameedi's opinion (which to some degree is consistent with Dr. Kushner's insofar as both found marked limitations in similar categories of social interaction and dealing with stress), it is ambiguous which portions of Dr. Kushner's opinion ALJ Sedaca believed were entitled to "some" weight.

Compounding the lack of clarity, when reviewing Dr. Kamin's report that included

---

[15]    See also, e.g., Nunez v. Berryhill, 16 Civ. 5078, 2017 WL 3495213 at *26 n.67 (S.D.N.Y. Aug. 11, 2017) ("[T]he ALJ did not specify what portion of Dr. Bhanusali's opinion was given 'some weight.' It is unclear whether the ALJ gave all of Dr. Bhanusali's opinions some weight or whether the ALJ gave only Dr. Bhanusali's opinion on plaintiff's postural activities some weight."); Callahan v. Colvin, No. 14-CV-06553, 2015 WL 5712334 at *6 (W.D.N.Y. Sept. 29, 2015) ("Overall, the ALJ assigned only 'some weight' to Dr. Holder's opinion, again stating without explanation that it 'is inconsistent with the objective medical evidentiary record and his own treatment records discussed above, when viewed in its totality.' . . . His generic statement that Dr. Holder's opinion is 'inconsistent' with the record does not allow for meaningful judicial review and does not constitute a 'good reason' for purposes of fulfilling the Commissioner's duty under the applicable regulations."); Matthews v. Comm'r of Soc. Sec., No. 13-CV-195, 2014 WL 5392991 at *5 n.1 (D. Vt. Oct. 23, 2014) ("The ALJ's statement that he afforded 'some' weight to Dr. Diercksen's opinions is vague: is 'some' a substantial amount or just a little?").

mild to moderate limitations, ALJ Sedaca gave Dr. Kamin's opinions "some weight" because "overall, the evidence suggest[ed] somewhat <u>greater restrictions</u> than were noted by Dr. Kamin," again without explanation. (<u>See</u> pages 15, 17 above (emphasis added).) The Court accordingly lacks a clear assessment of Paulin's mental limitations, and questions whether the severity of those limitations was properly accounted for in ALJ Sedaca's ultimate RFC and disability determinations.

Finally, ALJ Sedaca's credibility and RFC determinations were based, in part, on a mischaracterization of the hearing testimony. ALJ Sedaca wrote that, while Paulin "reported significant problems with difficulty leaving his home and inability to travel independently . . .[,] in other testimony and in other reports, he is noted to be able to socialize with friends and . . . neighbors." (<u>See</u> pages 17-18 above.) ALJ Sedaca highlighted that Paulin "conceded that when he was working he was able to use public transportation independently though he testified that he had been travelling only with his mother for the past 7 years." (<u>See</u> page 18 above.) Additionally, ALJ Sedaca stated that the RFC was supported by Paulin's "reported activities like in fact being able to use public transportation when he worked and being able to concentrate well enough to watch television and even pass a training course for security guard work." (<u>Id.</u>)

ALJ Sedaca placed undue emphasis on what she viewed as a "gotcha" moment during the hearing. Paulin testified that his "mother usually takes [him] places . . . because [he] ha[s] difficulties going some places . . . by [him]self," and that "for the last seven years" he only used public transportation when accompanied by his mother due to his "nervousness, . . . panic attacks, fears of crossing the street, and feeling paranoid." (<u>See</u> page 2 above.) Later in the hearing, Paulin testified that he got to work by taking the bus or getting a ride from his brother, and admitted that he had to "force [him]self" to go alone if his mother was unavailable. (<u>See</u> page 3 above.)

Whatever contradiction these statements present, ALJ Sedaca ignored that Paulin was

fired from all three security guard positions for lateness, getting "to things slower than others" and "missing a lot of days." (See page 3 above; see also Paulin Br. at 5 ("Whenever he was obliged to take public transportation to the job assignment on his own, he would take too long to get to work and be tardy.").) Paulin's mother's testimony also emphasized Paulin's difficulties traveling alone:

> Q. Okay. And what about Labar, does he ever take a bus or a train?
>
> A. No, not recently. He used to years ago but then when he was taking the train or the bus to work, we would start him two and three hours and it would take him - - he would still get to work late because he - - he would stand at the corner for half an hour waiting for no cars to be there for him to cross the street.
>
> Q. Okay. Let's talk about the security work. How did he get to work when he was doing the security jobs?
>
> A. Well, when he was getting the security job, if I couldn't take him, my son took him or if he had to take the bus or the train, he wouldn't get there in time. He would never get there on time. And this is - - was one of the reasons that they fired him because he couldn't get to work. If the buses were too crowded, the trains were too crowded, he would wait. He would wait to cross the street. It was - - it was just horrendous and I had to work.

(R. 89; see also Paulin Br. at 6 (Paulin's mother "testified that [Paulin] tried very hard to work at three jobs, but simply could not succeed because of his inability to get to work on public transportation on his own at a reasonable rate of speed, as well as his fear of going to work in general.").)

Paulin's and his mother's testimony indicated that he was incapable of traveling alone. As such, and considering the testimony as a whole, that Paulin had to "force [him]self" to use public transportation evidences the severity of his psychiatric limitations, not his ability to work. (See Paulin Reply Br. at 6-7 ("The ALJ did rely on the fact that the claimant took public transportation sometimes to get to those jobs on his own . . . . However, these work attempts are actually the best evidence of disability.").) Considering the testimony in context also raises serious questions

regarding vocational expert Julie Andrews' testimony. One of ALJ Sedaca's hypothetical questions to Andrews asked: "In addition to the above limitations, the individual is now limited to unscheduled absences more than . . . two times per month." (See page 6 above.) Andrews testified that such absences would affect available job positions "to the point where there would not be any full-time competitive employment positions that would be viable." (Id.) ALJ Sedaca's final hypothetical asked: "So we're not talking about the unscheduled absences or the psychological off-task but instead . . . - - let's say lateness to work - - we'll say if it is more than . . . five times per month, would that [a]ffect the above jobs?" (Id.) Andrews responded that "[i]t would be unlikely that the individual would be able to maintain employment because of that." (Id.) These hypotheticals are no longer irrelevant to ALJ Sedaca's RFC and ultimate disability determination when Paulin's ability to travel independently is properly viewed as a detriment to his work ability.

ALJ Sedaca should have contacted Dr. Hameedi to ask whether his treatment sessions with Paulin encompassed "talk therapy," whether additional therapy would benefit Paulin and, if so, why Paulin was not referred, before rejecting Dr. Hameedi's opinions based on an allegedly conservative treatment history.[16/] On remand, the ALJ should seek this information from Dr.

---

[16/] The Court acknowledges that the GAF scores of 60 contained in Dr. Hameedi's March 2014 and March 2015 psychiatric reports are, as ALJ Sedaca noted, incompatible with the marked to extreme limitations noted. (See page 17 above.) ALJ Sedaca thus should have inquired whether these GAF scores had any probative value in terms of Paulin's overall functioning and the particular limitations noted in the two psychiatric reports. See, e.g., Finnegan v. Berryhill, No. 16-CV-03939, 2017 WL 4990565 at *4 (E.D.N.Y. Oct. 30, 2017) ("[T]o any extent the ALJ was concerned about inconsistencies or lack of support in the record relied upon by the treating physicians, the ALJ has a sua sponte duty to contact the treating physicians to determine if the required information was available."); L'Ouverture v. Comm'r of Soc. Sec., 16 Civ. 1809, 2017 WL 4157369 at *15 (S.D.N.Y. Sept. 18, 2017) ("'[I]f a physician's finding in a report is believed to be insufficiently explained, lacking in support, or inconsistent with the physician's other reports, the ALJ must seek clarification and additional information from the physician.'"); Busby v. Berryhill, No. 16-CV-664, 2017 WL (continued...)

Hameedi and reconsider, if necessary, Paulin's treatment history. The ALJ also should more fully explain the weight given to Dr. Hameedi's opinions and why, providing clear reasons, supported by the record, for any subsequent determination. Finally, the ALJ should reevaluate Paulin's ability to travel independently, and assess what weight, if any, that evidence should be given in light of Paulin's work history, the hearing testimony and the remainder of the record evidence.

## CONCLUSION

For the reasons set forth above, the Commissioner's motion (Dkt. No. 21) is <u>DENIED</u> and Paulin's motion (Dkt. No. 14) is <u>GRANTED</u> to the extent of remanding the case to the Commissioner for further consideration.

SO ORDERED.

Dated:       New York, New York
               November 27, 2017

_____
**Andrew J. Peck**
United States Magistrate Judge


Copies ECF to:      All Counsel

---

[16]/     (...continued)
3575893 at *2 (D. Conn. Aug. 18, 2017) ("When an ALJ perceives inconsistencies in a treating physician's report, the ALJ bears an affirmative duty to seek out more information from the treating physician and to develop the administrative record accordingly by making every reasonable effort to re-contact the treating source for clarification of the reasoning of the opinion." (citation & quotations omitted)).